## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **CHARLES ROBERT CANTER III,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No.: RWT 11cv918 |
| | * | |
| **MARTIN O'MALLEY,** *et al.***,** | * | |
| | * | |
| Defendants. | * | |
| | * | |

## <u>MEMORANDUM OPINION</u>

On April 8, 2011, Plaintiff filed a Complaint with sixty-seven attached exhibits against twenty-one Defendants employed by the federal government and the state of Maryland.  ECF No. 1.  Plaintiff alleges that Defendants violated his First, Fourth, Fifth, Eighth, and Ninth Amendment rights as provided by the United States Constitution.  <u>Id</u>.  Plaintiff seeks $500,000 in monetary damages, $250,000 in compensatory damages, an immediate transfer out of his current prison, $1 for each constitutional violation committed by Defendants, criminal charges filed against four Defendants, the revocation of a Defendant's psychological clinical license, and the termination of three Defendants from the Department of Corrections.  ECF No. 1 at 26-27.  On August 8, 2011, Plaintiff filed a motion to appoint counsel.  ECF No. 17.

On August 8, 2011, Defendants Flury, Pac, and Bray filed a motion to dismiss, or in the alternative, a motion for summary judgment.  ECF No. 14.  On September 26, 2011, remaining Defendants filed a motion to dismiss, or in the alternative, a motion for summary judgment.  ECF No. 23.  On October 31, 2011, Plaintiff filed his opposition to the motions to dismiss or for summary judgment.  ECF No. 26.  Upon review of the papers filed, the Court finds a hearing in this matter unnecessary.  <u>See</u> Local Rule 105.6 (D. Md. 2011).

**I. Appointment of Counsel**

Before discussing the factual background of this case, the Court will first address Plaintiff's motion to appoint counsel.

A federal district court's power to appoint counsel in civil actions under 28 U.S.C. § 1915(e)(1) is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances.  See Cook v. Bounds, 518 F.2d 779, 780 (4th Cir. 1975); see also Branch v. Cole, 686 F.2d 264, 266 (5th Cir. 1982).  The question of whether such circumstances exist in a particular case hinges on the characteristics of the claim and the litigant.  See Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), *abrogated on other grounds by* Mallard v. U.S. District Court, 490 U.S. 296, 298 (1989).  Where a colorable claim exists but the litigant has no capacity to present it, counsel should be appointed.  Id.

Plaintiff raises numerous claims[1] against state and federal government officials some of which are based only on the fact that he sent them a letter notifying them of his fears and allegations of abuse.  ECF No. 1.  Plaintiff's pleadings include numerous exhibits and cite case law in support of his claims.  Id.  Upon careful consideration of the motions and previous filings by Plaintiff, the court finds that he has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so.  The issues pending before the court are not unduly complicated and no hearing is necessary to the disposition of this case.  Therefore, there are no exceptional circumstances that would warrant the appointment of an attorney to represent Plaintiff under § 1915(e)(1) and his motion will be denied.

---

[1] The allegations are set forth more fully below.

**II. Background**

Plaintiff alleges various incidents of abuse and unnecessary uses of force against him.  He claims he is targeted for abuse because he is homosexual and transgendered.  Plaintiff also states he suffers from bipolar disorder and schizoaffective disorder.  When he is not confined to disciplinary segregation, Plaintiff states he is assigned to a special housing unit for inmates with psychiatric disorders.

Plaintiff's claims against Governor O'Malley, Surgeon General Regena Benjamen, Secretary of Corrections Gary D. Maynard, and Commissioner of Corrections Michael J. Stouffer are based on his assertion that each of them was made aware of his allegations of abuse at North Branch Correctional Institution (NBCI) but did nothing in response to his letters to them.  ECF No. 1 at 5-9.  In his letters to each of these officials Plaintiff alleges that correctional officers are harassing him, he suffers from mental illness, he is suicidal, and he is in fear for his life.  See id.  Each letter ends with Plaintiff warning that if he does not receive a reply, he will be forced to add them to his lawsuit as Defendants.  He asserts in his Complaint that their lack of response is a deliberate indifference to a known risk of harm to him and that each had a duty to investigate the allegations made in his letters.

The claims against the remaining Defendants stem from several incidents during which Plaintiff was subjected to the use of force or other penalties for his misbehavior.  The first incident occurred on August 25, 2010, and involved Plaintiff as well as four other inmates who were housed on disciplinary segregation with Plaintiff.  ECF No. 23, Ex. 2.  Segregation inmates are required to be in cages during their outside recreation periods.  Plaintiff, along with inmates Derrick Dirton, Thomas Alston, Yahyi Shiheed, and Karl Berrain allegedly refused to exit the recreation cages after recreation period was completed.  Id. at 3-4.

3

According to the investigative reports regarding the use of force, authorization was given by Chief of Security F. Bishop to use force to gain the inmates' compliance with orders to leave the recreation cages.  Id.  The team consisted of seven officers, two of whom were assigned to operate pepper ball launchers and pepper spray.  Id.  The team approached inmate Dirton first and Laura Moulden of the psychology department attempted to convince Dirton to comply with orders to leave the recreation cage.  Id.  Dirton refused repeatedly to comply; therefore the pepper ball launcher was used, forcing Dirton to the rear of the cage where Sgt. Smith was positioned.  Id.  When Dirton reached the rear of the cage, a short burst of pepper spray was applied to his facial area.  Id.  At that time the team of officers forced Dirton to the ground, applied restraints, and escorted him to the Medical Room inside the Housing Unit where he was examined by R.N. Steve Bray.  Id.  Dirton was then strip searched, photographed, and given a shower for further decontamination.  Id.

Plaintiff was the next inmate approached after Dirton was removed from the area.  Id.  No use of force was necessary regarding Plaintiff, because he complied with orders to leave the recreation cage and returned to his assigned cell without further incident.  Id.  No use of force was required to remove Berrain from the recreation cages, but pepper spray was used on Alston and Shiheed to gain their compliance with orders to submit to being restrained and escorted from the area.  Id.  At the time Alston and Shiheed were pepper-sprayed, Plaintiff was no longer in the area.  Id.

Plaintiff's chief complaint about this incident concerns the penalties imposed after it occurred.[2]  He states he was found not guilty of the infraction he was given for disobeying a

---

[2] Plaintiff named Laura Moulden as a Defendant because he asked her to report the abuse and neglect that occurred following the August 25, 2010 incident, but she would not because, Plaintiff claims, the correctional officers are her relatives.  He further claims she is hindering him from receiving mental health treatment by forcing him to stay on segregation instead of being moved to the mental health tier.  ECF No. 1 at 22.

direct order, yet was subjected to Lt. Harbaugh's orders to strip the cells of the inmates involved, leaving only a mattress and basic clothing.[3]   Plaintiff asserts he presented witnesses at his adjustment hearing who testified that he was not asked to comply with orders to be handcuffed as stated in the Notice of Infraction written by Officer Adams.   He claims that because the hearing officer found his witnesses' testimony credible, it establishes that Adams lied in the Notice of Infraction, which is written under oath.   ECF No. 1 at Exhibits (letter to Allegany County State's Attorney dated September 2, 2010).   Harbaugh's orders regarding property being removed[4] allowed for the subject inmates to earn the right to have the property gradually returned if they displayed positive behavior.   ECF No. 23, Ex. 2 at 30.   Additionally, the five inmates were placed on bag meals for five days and the following procedure implemented for meal delivery:

> The inmate will place his chair under the security slot and go to the rear of the cell face the wall, place both hands on the wall and assume a kneeling position.  Once in this position staff will open the security slot and place the bag meal on the chair.  If positive behavior is maintained on [August 30, 2010] these inmates will be returned to tray status to be fed in accordance with the policy in place regarding the remainder of the segregation inmates.

Id.   All five inmates were also restricted to receiving recreation inside in the education booth areas.   Regular recreation status was to be reinstated on August 30, 2010.   Id.   Plaintiff claims the imposition of these restrictions violated due process because he was found not guilty of the

---

[3] Plaintiff also claims that Harbaugh forced him to stay in the outside recreation cage and made him watch the extraction team "gun down" another inmate with the pepper ball gun.  Additionally he claims the indoor recreation restriction was imposed on him for thirty-nine days.  ECF No. 1 at 10-15.

[4] Plaintiff names Officer P. Deist as a Defendant because he removed the property from Plaintiff's cell without having Plaintiff present.  When the property was returned, Plaintiff claimed some of it was missing.  ECF No. 1 at 18.

infractions charged, and he claims that the bag meals did not comply with his medically ordered diet of 2000 calories a day.[5]  ECF No. 1.

On August 31, 2010, Plaintiff claims he told Officer Crowe that he was suicidal and Crowe replied, "if you felt like killing yourself you would not have told me."  Id. at 19.  Plaintiff claims he told Officer Barrett he was having suicidal thoughts at approximately 12:10 a.m., and Barrett simply responded that Plaintiff should put in a sick call and lay down.  Id. at 21.  Plaintiff alleges he told Officer Hollins that he was going to kill himself and that he wanted to be put on suicide observation until he could be seen by a psychiatrist.  Plaintiff claims Hollins told him, "you fucking faggot kill yourself don't fucking tell me do it like Westly Williams did."  Id. at 19.  Approximately ten minutes later, Plaintiff claims he tried to commit suicide by hanging himself from the sprinkler system nozzle on the ceiling of his cell.  His attempt failed when the sprinkler broke, and Plaintiff fell to the ground.[6]  Id.

Defendants provide a different account of the events leading to the damage to the sprinkler system in Plaintiff's cell.  A Use of Force Report submitted by Defendants describes an incident taking place on September 1, 2010.  ECF No. 23, Ex. 10.  Plaintiff was observed by Lt. Harbaugh and Sgt. McAlpinel removing the screws from the protective cage around the fire suppression sprinkler system in his cell.  He was ordered to stop several times, but refused to do so and taunted the officers with statements such as "I'm gonna break this sprinkler head."  Id. at 2.  Even after Plaintiff was advised by Harbaugh that if he did not stop tampering with the protective cage and the fire suppression system pepper spray would be applied, Plaintiff stated,

---

[5] Plaintiff additionally claims that Sgt. Simmons, the dietary officer, knew Plaintiff was on a medical diet for a severe medical acid problem but Simmions refused to honor Plaintiff's diet on August 31, 2010.  ECF No. 1 at 24.  He claims that he had a severe acid flare up resulting in a medication change as a result of the refusal to honor his medical diet.  Id.  He states Simmions was deliberately indifferent to his serious medical need.  Id.

[6] On September 1, 2010, at 2:30 p.m., Plaintiff states, Lt. Harbaugh used unnecessary force against him when he was sprayed with pepper spray resulting in Plaintiff developing eye problems.  ECF No. 1 at 14.  It is unclear if this incident is related in any way to Plaintiff's alleged suicide attempt.

"I already told you I'm breakin the sprinkler head so go ahead and spray me." Id.  Plaintiff's door was ordered opened, officers entered the cell, and applied pepper spray to his face.  Id. Plaintiff then laid on the floor and complied with orders to be handcuffed.  He was then escorted to the medical room where he received a shower for decontamination.  Id.  At the time of the incident, Plaintiff also provided a statement in which he admits to removing screws from the protective cage and attempting to tamper with the fire suppression system.  He also admits officers entered the cell and pepper sprayed him in order to prevent him from hurting himself and prevent destruction of state property.  Id. at 14.  There is no mention of a suicide attempt or a noose pulling the sprinkler system down.

Plaintiff claims that Physician's Assistant Greg Flury was supposed to see him on September 4, 2010, to address mental health and medical issues.  Plaintiff claims his mental health issues were the result of previous uses of force.  Id. at 24-25.  He avers that Flury lied and said that he refused to come to sick call and that Plaintiff refused to sign a release of responsibility.  Id. at 25.  Flury claimed Plaintiff chose recreation over sick call, and he observed Plaintiff who did not look like he was having any respiratory distress as he claimed.  Id.

On September 5, 2010, Plaintiff claims Lt. Llewellyn sprayed him in the face with an entire fogger can of "10% OC spray."  Id. at 16.  He claims he was confined in a small, secured area where he could not pose a threat to anyone when the force was used against him, because he would not exit the area.  Id.  Plaintiff asserts the force was used in retaliation for the events occurring on August 25, 2010.  Id. at 16-17.   Records reflect this incident was prompted by Plaintiff's refusal to leave the "education booth" which was being used as a temporary, indoor recreation area for segregation inmates.  Id. at 13.  On the same day, Plaintiff claims Lt. Brewer used force against him when he refused to return his "feed-up tray."  Id. at 14.

Defendants provide two Serious Incident Reports regarding Use of Force used against Plaintiff on September 5, 2010. ECF No. 23, Exs. 12, 14. The first incident occurred at approximately 1:30 p.m. when Plaintiff refused verbal orders to be handcuffed and escorted back to his cell from the day room where he was for recreation. Id., Ex. 12 at 3. Several attempts were made to gain compliance from Plaintiff, but they were unsuccessful. A final order was given to Plaintiff to comply, but he refused. Lt. Llewellyn then sprayed a short burst of pepper spray to Plaintiff's face. After the pepper spray was used, Plaintiff complied with orders. Id. Plaintiff provided a statement regarding the incident on the date it occurred. Id. at 23. In it he admits refusing to leave the recreation cages because he was protesting the restrictions placed on him by Lt. Harbaugh after being found not guilty of the ticket issued on August 25, 2010. Id. He also states that he will "keep bucking" because he is a psychiatric patient and the psychology department refuses to help him. Id. He then demands to see someone from Headquarters or IIU about the alleged abuses being committed at NBCI. Id.

Later the same day, Plaintiff was again subjected to pepper spray when he refused to stop using his "feed-up tray" to bang on the camera and the cell door of the holding cell he had been placed in after destroying the protective cage over the fire suppression sprinkler in his cell. ECF No. 23, Ex. 14. Following a familiar pattern, Plaintiff was ordered several times to stop the behavior and refused to stop despite warnings of the impending use of pepper spray. Lt. Brewer applied the pepper spray to Plaintiff's face at which time Plaintiff chose to comply with orders to relinquish the tray. Id. at 3. Plaintiff was taken to medical where he received a decontamination shower without further incident. Id. Plaintiff again provided a written statement. Id. at 17. In his statement he admits he refused to give the tray back, but blames the officer who gave it to him because it was the wrong kind of tray. Id. He further states he was not hurting anyone

inside the holding cell and that the use of pepper spray against him was unnecessary.  He again states he wants to talk to someone from headquarters because he is not receiving proper mental health treatment.  Id.

In his Response in Opposition, Plaintiff attaches as an exhibit an ARP he filed regarding the incident.  ECF No. 26, Attach. 9 at 22.  His version of the events is that he was given a hard tray when he was supposed to receive a bag meal, therefore he began tapping the tray on the bottom of his door and when asked to return the tray he refused.  Id.  Plaintiff told the officer in charge he would not give the tray back because he was not supposed to give it to him and it was their fault because they violated a security order.  Id.  Plaintiff even admits he was placed on bag lunches for five days "due to violent and extremely disruptive behavior."  Id.  Plaintiff protests, however, that when he was sprayed with pepper spray he was standing in the cell with his hands in the air and "I was not doing nothing for force to be used."  Id.

On September 6, 2010, Plaintiff claims he had his fingers on the side of the feed up slot in his cell, discussing an issue with Officer Yutzy, when Yutzy slammed the slot door shut and smashed Plaintiff's fingers between the door and the frame.  ECF No. 1 at 23.  Plaintiff claims this caused a large amount of blood to come out of his left middle finger.  Id.  He states after he removed his hand from the slot his finger was numb and turned black and blue; he claims the injury "was bleeding non-stop."  Id.  Plaintiff claims he was taken to medical following the incident where photographs were taken.  Id.  The reason for Yutzy's actions, according to Plaintiff, is that he was retaliating against Plaintiff for the August 25, 2010 incident.  Id.

Defendants' account of the September 6, 2010 incident is documented in a Use of Force Report.  ECF No. 23, Ex. 17.   The incident occurred at 5:30 a.m., when Plaintiff was in a holding cell and the "feed up slot [was] breached."  Id. at 6.  Officers Adkins and Yutzy closed

the feed slot after talking to Plaintiff about allowing the feed up slot to be secured.  Id.  Plaintiff

complained that his finger was pinched in the slot, and he was taken to the Medical room where

he was seen by Nurse Autumn Durst who administered care in the form of a band-aid.[7]  Id.  After

receiving treatment, Sgt. Thompson and Officer Wass were escorting Plaintiff back to his cell,

when he fell to the floor and refused to move after several orders to do so.  After refusing several

orders, Plaintiff was picked up and carried to the holding cell by Officers Wass, Welsh, Kisner,

Adkins, Ritchie, Sellers and Sgt. Thompson.  Id.  Once placed in his cell Plaintiff was ordered to

remain on the floor facing down while the officer exited the cell.  Id.  Plaintiff began threatening

staff, stating "I'm coming up and it's going to be on."  Id. at 3.  At that time Sgt. Thompson

sprayed Plaintiff with pepper spray.  Id.  Plaintiff received medical treatment including a shower,

for exposure to pepper spray.  In his statement Plaintiff explained he was manic and not

complying with orders, and wrote that the pepper spray was used against him in good faith to

restore control over him.  Id. at 23.

On September 8, 2010, Plaintiff received a Notice of Infraction from Lt. Harbaugh.  ECF

No. 5 at 26.  Harbaugh alleged that:

> I was called over to C wing due to Inmate Canter, Charles refusing to let
> officers escort him back to his assigned cell.  Myself along with officer
> Portmess began to escort Canter back to his cell at which time he started
> raising his voice and threatening to sue us.  After inmate Canter stepped
> into his cell, we called control center to have the door closed.  After door
> 1620 was closed I started to remove the hand restraints from Inmate
> Canter's wrist.  As I removed the last restraint from Inmate Canter's
> wrist he jammed his right arm out of the feed up slot just as we were in
> the process of closing the security slider on the cell door. I asked Inmate
> Canter to remove his arm from the slot at which time he refused to
> comply.  I advised Inmate Canter that failure to comply with my order
> would result in an adjustment at which time he stated "fuck you, I'll see
> you in court you bitch!"  I then gave Inmate Canter a direct order to

---

[7]  The injury to Plaintiff's finger is described as a "dark purple bruise under [his] middle finger on his left hand. Cuticle was pulled back from nail, small amount of blood present."  ECF No. 23, Ex. 17 at 26.

> remove his hand from the door slot at which time he said, "I'll kill you
> Harbaugh, Portmess and all you bitches that try to fuck with me."

Id. There is an indication at the bottom of the Notice of Infraction that Plaintiff was placed on "meal loaf" also known as "segregation loaf," following the incident. Id.

Plaintiff claims his placement on segregation loaf was improper because the DCD (110-18) does not allow placement on it for threatening an officer. ECF No. 5 at 16. He further claims that Harbaugh not only violated the DCD regarding segregation loaf, but he should not have been placed on it due to the 2000 calorie medical diet which was ordered for him. Plaintiff further claims he was put on segregation loaf to discourage him from writing a statement alleging unnecessary use of force by Sgt. Smith who slammed his arm in the feed-up slot. Id. A document submitted by Plaintiff indicates that there were no medical or psychological reasons to remove him from special management meals. Id. at 20. Plaintiff also protested his placement on the meals because, "I never threatened to kill him I called the OIC a bitch and I would not close the slot, not once did I [throw] feces, urine nor did I hold the slot during or collection of feed up trays or distribution of meals." Id. at 22.

Defendants describe Plaintiff as manipulative with poor behavior. One report notes:

> It is apparent by Inmate Canter's actions that he is determined to demonstrate poor behavior to accomplish his goal, no matter the cost to his personal safety. It is proof positive that restrictions presently used to deter Inmate Canter's poor behavior, work minimal at best. If or when we are authorized to use the security restraint chair, I recommend the use of it for Inmate Canter, hoping it's [sic] use would assist in correcting Inmate Canter's poor behavior by preventing him from intentionally planning to act out to the point that staff has no choice but to use force to control him. If it does not deter his behavior, it would maintain control of him and provide a safer work environment for staff.

ECF No. 23, Ex. 17 at 7.   Psychology records note that Plaintiff participated in an anger management group, but quit the group abruptly after stopping his medication.[8]  ECF No. 23, Ex. 21 at 2.   On September 16, 2010, the psychology department was notified that Plaintiff had expressed suicidal intentions in a letter to the warden, but Plaintiff denied the statement when Ms. Moulden approached him.  Id. at 6.   Plaintiff has stated he no longer wished to receive psychological services on several occasions and withdrew his participation from group therapy without a precipitating event.  Id. at 2-13.   Plaintiff was placed on suicide monitoring on September 2, 2010, during which time he expressed to staff that he would continue to act out in order to get to Patuxent.  Id. at 7.  He was informed by Moulden that he was not eligible for a transfer to Patuxent and that his good behavior would be required for him to be transferred back to the Special Needs Unit (SNU).  Id.   Indeed, it appears Plaintiff's misbehavior and his statements that he is suicidal are an effort to manipulate a decision to transfer him to Patuxent. Id. at 8.  His anger is based on the fact that his manipulations have been unsuccessful.  Id.

### III. Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

---

[8]  Plaintiff complained that Lithium hurt his stomach.  ECF No. 23 at Ex. 21.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" <u>Bouchat v. Baltimore Ravens Football Club, Inc.</u>, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." <u>Dennis v. Columbia Colleton Med. Ctr., Inc.</u>, 290 F.3d 639, 644-45 (4th Cir. 2002) (citation omitted). The court must, however, also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" <u>Bouchat</u>, 346 F.3d at 526 (quoting <u>Drewitt v. Pratt</u>, 999 F.2d 774, 778-79 (4th Cir. 1993)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>see also</u> <u>Smith v. Ozmint</u>, 578 F. 3d 246, 254 (4th Cir. 2009).

### IV. Analysis

#### a. Supervisory Liability

Plaintiff's claims against Governor O'Malley, Surgeon General Regena Benjamen, Secretary of Corrections Gary D. Maynard, and Commissioner of Corrections Michael J. Stouffer, as well as his claims against Warden Shearin, are subject to dismissal as they are based on a theory of respondeat superior which is not cognizable in claims raised pursuant to 42 U.S.C. § 1983. <u>See</u> <u>Love-Lane v. Martin</u>, 355 F.3d 766, 782 (4th Cir. 2004); <u>see also</u> <u>Trulock v. Freeh</u>, 275 F.3d 391, 402 (4th Cir. 2001).

13

Supervisory liability in the context of a § 1983 suit "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  Baynard v. Malone, 268 F. 3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F. 2d 368, 372 (4th Cir. 1984)).  Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged practices; and (3) there was an affirmative causal link between the supervisor's inaction and the constitutional injury suffered by the plaintiff.  See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

Plaintiff's vague allegations that he was the subject of abuse, coupled with the numerous occasions that his claims were proven unfounded, were insufficient to put any of the Supervisory Defendants charged with his care on notice that he had suffered a constitutional injury.  His attempt to force liability on the Governor and the Surgeon General by simply writing a letter and stating that failure to respond constituted deliberate indifference is illogical.  Defendants are entitled to summary judgment on this claim.

### b. Excessive Force

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6 (1992) (quotation omitted). This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety

of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response.  Whitley v. Albers, 475 U.S. 312, 321 (1986).  The absence of significant injury alone is not dispositive of a claim of excessive force.  Wilkens v. Gaddy, 130 S. Ct. 1175 (2010).  The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm.  Id.

The force used against Plaintiff in each incident at issue was pepper spray.  The undisputed facts establish that prior to the use of pepper spray, Plaintiff refused a direct order.  Plaintiff may disagree with the decision that pepper spray was needed, but it is not for him to decide whether a security threat exists.  Defendants are not required to risk their personal safety or to permit the needless destruction of state property before force may reasonably be applied.  Plaintiff has failed to establish that force was used in a malicious or sadistic manner against him.  His bald allegations are outweighed by the balance of the evidence in the record and undermined by his own admissions that he did not follow direct orders.  Defendants are entitled to summary judgment in their favor.

Additionally, Plaintiff's claim that Officer Yutzy slammed his finger in the feed-up slot in a malicious manner, causing his finger to swell and bleed profusely is belied by the record.  Medical documentation describes the injury to his finger as minor and pictures of his finger, although of poor quality, do not support his allegation.  ECF No. 23, Ex. 17 at 26.  In light of the record evidence establishing Plaintiff's habit of holding his feed-up slot open for purposes of forcing interactions with staff, as well as his numerous threats to sue correctional staff, his claim against Yutzy must fail.  Assuming Yutzy closed the slot before Plaintiff removed his hand from

the slot, it is clear from the account of the incident that Plaintiff was given fair notice that the slot was being closed.  Id. at 6.  Equally clear from the record is the fact that Plaintiff knows holding the slot open is an inappropriate way to request assistance from staff.  Defendants are entitled to summary judgment on this claim.

### c. Medical Claims

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  Gregg v. Georgia, 428 U.S. 153, 173 (1976).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  De'Lonta v. Angelone, 330 F. 3d 630, 633 (4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)).  In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Objectively, the medical condition at issue must be serious.  See Hudson, 503 U.S. at 9 (finding that there is no expectation that prisoners will be provided with unqualified access to health care).  Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. See Farmer, 511 U.S. at 839-40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that

risk." Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F. 3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844)). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." Farmer, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. Brown v. Harris, 240 F.3d 383, 390 (4th Cir. 2000).

There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. Bowring v. Goodwin, 551 F.2d 44, 47 (4th Cir. 1977). A prisoner is entitled to such treatment if a "physician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." Id. The Bowring court further concluded that the aforementioned right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable. Id. at 48. Thus, a substantial risk of suicide is a serious medical condition. See Brown, 240 F.3d at 389; Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992).

Plaintiff's stated claims regarding medical care include the following: that he was supposed to be seen by Physician's Assistant Greg Flury but was not; he is not receiving adequate psychological treatment; and he was denied a medically prescribed diet. Plaintiff's claim against Flury leaves much to the court's imagination. Although he claims he was to be

seen for medical and mental health issues resulting from prior uses of force against him, he does not provide a description of the symptoms he suffered.  Rather he simply claims that he now wears bifocals due to the use of pepper spray against him. There is, however, nothing noted in the extensive record before the court, regarding Plaintiff's vision being adversely effected by pepper spray. Medical records submitted by Flury indicate that Plaintiff was observed at recreation and did not exhibit any signs of respiratory distress.  ECF No. 14, Ex. A ¶ 6; Ex. B at 10.  After each of the times Plaintiff was pepper sprayed he was evaluated by a nurse and there were no respiratory distress issues noted.  Id., Ex. B at 1-9, 11-16.  Assuming, as the court must, that Plaintiff did not refuse to see Flury, there is no evidence that there existed a serious medical need that required immediate attention.  An error in judgment, if one occurred, is an insufficient basis for a claim of deliberate indifference to a medical need.

With respect to Plaintiff's psychological treatment, it is clear from his behavior that he is in need of intervention.  The lack of effective treatment provided, however, appears to be Plaintiff's own doing.   Several notations confirm that Plaintiff simply stopped taking medications prescribed for his bipolar disorder and abruptly refused to accept psychological services.  ECF No. 23, Ex. 21.   It appears his main concern is not that the prison needs to treat his psychological issues, but that he wants to receive treatment only after he has been transferred to another institution or to a housing unit other than disciplinary segregation.  The refusal of psychology staff to allow Plaintiff to manipulate his housing assignment through bad behavior is not evidence of deliberate indifference.  Rather, it is evidence that staff recognizes Plaintiff's ulterior motives and does not allow him to subvert their efforts to modify his behavior and deliver services suited to his disorder.  Defendants are entitled to summary judgment on this claim.

### d. Harassment and Retaliation Claims

Plaintiff claims restrictions were placed against him after the August 31, 2010 event where he and four other inmates refused to leave recreation cages, because Lt. Harbaugh was retaliating against Plaintiff for attempting to file criminal charges against Adams, who wrote the notice of infraction for Plaintiff.  ECF No. 26 at 7.  Additionally he claims Harbaugh refused to allow Plaintiff to talk to the Internal Investigative Unit, withheld his mail, disapproved a "special visit," and did nothing when Plaintiff complained he was not receiving his medical diet.  Id. Plaintiff also states that Harbaugh does not properly investigate Administrative Remedy Procedure complaints (ARPs) and withholds ARP forms from Plaintiff.  Id.

A prisoner's claim that prison officials have retaliated against him for engaging in protected conduct is grounded in the First Amendment.  See Mount Healthy Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977); Thaddeus-X v. Blatter, 175 F.3d 378, 388 (6th Cir. 1999) (en banc). A retaliation claim requires prove of three elements: 1) the prisoner engaged in protected conduct; 2) an adverse action was taken against the prisoner that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) a causal connection exists between the first two elements, i.e., the prisoner's protected conduct motivated at least in part the adverse action.  See Thaddeus-X, 175 F.3d at 394.  To make out a prima facie case of retaliation, Plaintiff has the burden of showing that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind the conduct of Defendants.  See Mt. Healthy, 429 U.S. at 287 (1977).   In the prison context, Plaintiff must establish that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution or was not narrowly tailored to achieve such goals.  See Rizzo v. Dawson, 778 F.2d 527, 532 & n.4 (9th Cir. 1985). The preservation of internal order and discipline constitutes a legitimate goal of the

correctional institution. Id. at 532. After Plaintiff makes a prima facie showing, the burden shifts to Defendants to demonstrate that they would have reached the same decision even in the absence of Plaintiff's constitutionally protected conduct. See Mt. Healthy, 429 U.S. at 287.

In the instant case, Plaintiff has failed to establish a prima facie case of retaliation. Every imposition of more restrictive rules regarding property, recreation, and visitation were precipitated by Plaintiff's own behavior. "In the prison context, we treat [claims of retaliation] with skepticism because every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Cochran v. Morris, 73 F. 3d 1310, 1317 (4th Cir. 1996) (quotation omitted). Plaintiff makes much of the fact that he was found not guilty of an infraction written in response to his alleged participation in a collective effort to refuse orders to leave the recreation area. ECF No. 1 at Exhibits. The incident occurred on August 25, 2010, and Plaintiff's adjustment hearing took place on August 31, 2010. Id. Plaintiff was charged with yet another rule violation on August 31, 2010, when he again refused orders to return to his cell. Id. Thus, Plaintiff, who was already on disciplinary segregation, never earned the right to less restrictive conditions of confinement. The presence of a valid reason for adverse actions taken against Plaintiff nullifies the claim that the decision was retaliatory in nature.

Plaintiff's claim that he was prohibited from speaking with IIU and from filing ARPs is belied by the record evidence. With respect to IIU investigations, he has been the subject of nine investigations in 2008; three in 2009; one in 2010; and two in 2011. ECF No. 23 at Ex. 4. Many of the investigations involved interviews with Plaintiff in which he recanted his initial claims. Id. In one investigation Plaintiff had claimed a correctional officer kicked him in the face after he had thrown himself to the floor. Id. at 2. The video of the incident was reviewed by IIU and it showed correctional officers picking Plaintiff up and carrying him to another cell while he

continued to struggle with the officers.  Id.  An inmate witness whose name was provided by Plaintiff related that Plaintiff "tells stories to everybody" and said he had not witnessed the incident.  Id.  Ultimately Plaintiff admitted he did not have any injuries and it was determined his claim was unfounded.  Id.  Notwithstanding Plaintiff's record of making unfounded allegations, the IIU continued to respond to his requests for investigations, without any apparent interruptions from any of the Defendants.

With respect to ARPs, Plaintiff has presented evidence that refutes his own claim.  ECF No. 1 at Exhibits; and ECF No. 26.  The exhibits he presents include numerous ARPs all of which include a response, as well as documentation of an investigation of his claim.  To the extent that Plaintiff did not receive the responses he desires, that factor alone does not establish a retaliatory intent.  Defendants are entitled to summary judgment on this claim.

### e. Conditions of Confinement Claim

Plaintiff alleges that the removal of his personal property from his cell, requiring him to take bag meals, and limiting recreation to indoor recreation cages violated his Eighth Amendment rights. He also takes issue with being placed on "segregation loaf" because he did not engage in the precise misbehavior that is noted in the Division of Correction Directives (DCD) governing placement on the special management meal.  ECF Nos. 1, 26.

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment.  Rhodes v. Chapman, 452 U. S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society."  Id.  "In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that "the deprivation of [a] basic human need was *objectively* sufficiently serious, and that *subjectively* the

officials acted with a sufficiently culpable state of mind." <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted).   "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual." <u>Iko v. Shreve</u>, 535 F.3d 225, 238 (4th Cir. 2008) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 298-300 (1991)).

To establish a sufficiently culpable state of mind, there must be evidence that a known excessive risk of harm to the inmate's health or safety was disregarded. <u>See Wilson</u>, 501 U. S. at 298.  In other words, "the test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." <u>Brown v. N.C. Dept. of Corr.</u>, 612 F.3d 720, 723 (4th Cir. 2010) (quotation omitted).

The objective prong of a conditions claim requires proof of an injury.  "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." <u>Strickler v. Waters</u>, 989 F.2d 1375, 1381 (4th Cir. 1993).  "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." <u>De'Lonta</u>, 330 F.3d at 634.  Demonstration of an extreme deprivation proscribed by the Eighth Amendment requires proof of a serious or significant physical or emotional injury resulting from the challenged conditions. <u>See Odom v. S.C. Dept. of Corr.</u>, 349 F. 3d 765, 770 (4th Cir. 2003).

The record before this Court illustrates that Defendants did not have a sufficiently culpable state of mind because they were not aware of an excessive risk of harm to Plaintiff's health or safety based on his confinement.  The actions complained of by Plaintiff were penalties

enacted by Defendants in attempt to prevent him from his continued manipulative and destructive behavior.   Plaintiff has not demonstrated that Defendants knew of, much less disregarded, some threat to Plaintiffs health or safety based on his conditions of confinement.

Additionally, Plaintiff has not alleged, nor has he offered any proof of an injury resulting from the conditions imposed. With respect to his medically prescribed diet, his placement on segregation loaf was reviewed by medical and psychological staff who indicated there was no reason to remove him from that diet.   To the extent his placement on segregation loaf violated a Division of Correction directive, that fact alone does not mean Plaintiff's constitutional rights were violated.   See Riccio v. Cnty. of Fairfax, 907 F.2d 1459, 1456 (4th Cir. 1990) ("[A] state does not necessarily violate the constitution every time it violates one of its rules."); Ewell v. Murray, 813 F. Supp. 1180, 1183 (W.D. Va. 1995) ("Even if state law creates a liberty interest, violations of due process are to be measured against a federal standard of what process is due."). Defendants are entitled to summary judgment on this claim.

### f. Miscellaneous Claims

Assuming Plaintiff's claim that Defendants Crowe, Barret, and Hollins made insensitive and abusive statements to him regarding his sexual preference and his stated intentions of suicide, his claim fails.   Verbal abuse of inmates by guards, without more, states no claim of assault.   See Collins v. Cundy, 603 F.2d 825 (10th Cir. 1979) (per curiam); see also Carter v. Morris, 164 F.3d 215, 219, n.3 (4th Cir. 1999) (rejecting use of racial epithets as a basis for constitutional claim).   The statements alleged in this case are not condoned by this Court, but they fall short of acts forbidden by the Fourth, the Fourteenth, or the Eighth Amendments.   See Pink v. Lester, 52 F.3d 73, 75 (4th Cir. 1995) ("[N]ot all undesirable behavior by state actors is unconstitutional.").

### V. Conclusion

It is clear from the record that Plaintiff suffers from psychiatric illnesses as well as behavioral problems making treatment of his illnesses much more difficult.   This court is sympathetic to Plaintiff's dilemma, however, his blatant attempts to manipulate correctional employees for purposes of suing them are not condoned.   Despite the numerous pages of documents filed by Plaintiff, his filings fail to demonstrate any evidence that his constitutional rights were violated by Defendants.   Therefore, Defendants are entitled to summary judgment in their favor.  A separate Order follows.


Date: <u>January 25, 2012</u>                                      <u>               /s/               </u>
                                                                              ROGER W. TITUS
                                                             UNITED STATES DISTRICT JUDGE